

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7827 | **DATE** | 7/5/2001 |
| **CASE TITLE** | John M. Egas vs. Larry G. Massanari, Commissioner | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for summary judgment [12-1] is denied and defendant's cross-motion for summary judgment [13-1] is granted. This case is hereby dismissed with prejudice. Judgment is entered in favor of the defendant and against the plaintiff.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | JUL -6 2001 date docketed | 16 |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| RO | courtroom deputy's initials | FILED FOR DOCKETING 01 JUL -5 PM 4: 52 Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

JOHN M. EGAS,

    Plaintiff,

v.

LARRY G. MASSANARI, Acting
Commissioner of Social Security,[1]

    Defendant.

No. 00 C 7827

Judge Ruben Castillo

DOCKETED

JUL - 6 2001

## MEMORANDUM OPINION AND ORDER

Plaintiff John M. Egas seeks judicial review of the final decision of the Commissioner of Social Security, Larry G. Massanari, denying his applications for disability insurance benefits and supplemental and security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 423, 1382. Egas claims that the Administrative Law Judge's ("ALJ") decision to deny him benefits should be reversed and set aside because it was not supported by substantial evidence. Because we find that the ALJ reasonably concluded that Egas could perform a significant number of jobs in the national economy and was, therefore, not disabled within the meaning of the Social Security Act, we affirm the ALJ's decision, deny Egas' motion for summary judgment, (R. 12-1), and grant the Commissioner's cross-motion for summary judgment, (R. 13-1).

---

[1] On March 29, 2001, Larry G. Massanari became Acting Commissioner of Social Security. Therefore, pursuant to Fed. R. Civ. P. 25(d)(1) and 42 U.S.C. § 405(g), Massanari is automatically substituted as Defendant for Walter A. Halter, whom Egas originally named as the defendant in this case..

## RELEVANT FACTS

Egas was born on June 21, 1961, and he has an eleventh grade education. Egas alleges a disability since October 31, 1997. Before filing his claim, Egas had worked from 1979 to 1994 as a packet and order filler, inspector and laborer.

### I. Egas' Hearing Testimony

Egas testified at a Social Security Administration ("SSA") hearing held in Oak Brook, Illinois on May 14, 1999 before ALJ Robert Hanson. At this hearing, Egas' attorney testified that Egas was unable to work because of various psychiatric disorders consisting of depression, social phobia and agoraphobic condition. Egas testified that these disorders caused him to sweat, shake and panic when he left home, was at a job meeting or standing in a store. He stated that one of his main symptoms was the sensation that people were staring at him and he described the way he felt as "having a heart attack" or like he was "going to lose control." (R. 11-1, Admin. R. at 47, SSA Hr'g Tr.) Egas also said that his condition prevented him from concentrating or understanding simple instructions. He further stated that taking the drug Paxil reduced his depressive symptoms but made him feel tired in the middle of the day. Egas' typical day involved getting his son off to school and performing household chores such as cooking, washing dishes, vacuuming and mopping floors. Finally, Egas testified that he only left the home when he went to the doctor and he did not go shopping, perform any yard work, socialize or take his son anywhere.

### II. Vocational Expert Thomas Dunleavy's Testimony

Vocational Expert Dunleavy was asked two hypothetical questions by the ALJ regarding Egas' vocational profile and residual functional capacity. The first question involved a

hypothetical individual of Egas' age, education and work experience who had a remote history of substance abuse, and anxiety and depressive disorders which limited the individual to simple, repetitive work that did not involve unusual stress, work in small, confined spaces, contact with the general public or more than superficial contact with co-workers. In answer to this question, Dunleavy testified that such an individual could work as an office cleaner or a night watchman and that approximately 5500 to 7000 such jobs existed in the Chicago metropolitan area. The second question involved a hypothetical individual who, as a result of increased distress from leaving his home, had significant difficulty attending to simple tasks, tolerating minimal levels of stress or adapting to simple changes in occupational routine. In answer to this question, Dunleavy testified that such an individual would be precluded from performing any kind of work.

### III. Medical Evidence

Four doctors performed psychiatric examinations of Egas from May 1998 through May 1999. In May 1998, Dr. Mahim Voras performed a psychiatric examination of Egas at the request of the Illinois Disability Determination Service ("IDDS"). Egas related a history of avoiding situations which required him to be around people. Dr. Vora observed that Egas displayed no abnormal psychomotor activity, that he was sociable, maintained good eye contact, related well and demonstrated appropriate behavior throughout the thirty-minute interview. He also noted that Egas was not withdrawn, was able to understand and carry out instructions and handled the stress of the interview well. Dr. Vora diagnosed dysthymic disorder and social phobia.

On June 28, 1998, IDDS Dr. E. Kuester completed a psychiatric review of Egas. Dr. Kuester found that Egas was moderately limited in his ability to maintain attention and

concentration for extended periods, to work in close proximity to others without distraction and to interact appropriately with the general public. He reported that Egas could go out, drive, do chores and keep appointments. Dr. Kuester found that Egas suffered from dysthymia, social phobia (agoraphobia) and substance abuse in remission, but he concluded that these impairments only slightly restricted Egas' daily living activities, that they seldom produced deficiencies of concentration and that they moderately limited his ability to maintain social functioning.

In July 1998, Egas began treatment with psychiatrist Dr. McGrath. Dr. McGrath's intake interview notes reveal that Egas was applying for disability and that one of his treatment goals was to "get to work." (*Id.* at 165, July 4, 1998 McGrath Notes.) Egas presented with symptoms of social phobia, agoraphobia and depression, and he was diagnosed with panic disorder and agoraphobia. Egas was prescribed Paxil which helped him sleep and have fewer arguments with his wife, but which also caused side effects of sweating, constipation, diminished appetite and shaking. Over the course of the next three months of treatment, Egas' Paxil medication was increased and Dr. McGrath reported that Egas was calmer, less irritable and that his agoraphobia was "a little better," but that Egas described deteriorating sleep and anxious periods in enclosed areas.[2] (*Id.* at 160, Sept. 2, 1998 McGrath Notes.)

In November 1998, IDDS psychologist Dr. D.G. Hudspeth completed a fourth psychiatric review of Egas. Dr. Hudspeth found that Egas suffered from dysthymia, anxiety

---

[2] During this three month period, Egas missed three of seven appointments with Dr. McGrath. (R. 11-1, Admin. R. at 160-65, McGrath Notes.) The ALJ, however, noted only one missed appointment. Nevertheless, we do not agree with Egas that this factual error requires us to find that the ALJ's decision was unsupported by substantial evidence in light of the fact that the record demonstrates that Egas ventured from his home on several other occasions to visit his family and for medical treatment and disability proceedings.

4

disorder and substance abuse in remission, and that his impairments moderately limited his ability to understand, remember and carry out detailed instructions, his ability to work in close proximity to others without distraction and his ability to interact appropriately with the general public. Dr. Hudspeth opined that Egas "could perform simple and routine tasks in the work setting" provided he was not required to deal with the public and that his contact with co-workers was limited. (*Id.* at 168, Hudspeth Functional Capacity Assessment.) He reported that Egas' impairments moderately limited his ability to maintain social functioning but only slightly limited his daily living activities. Dr. Hudspeth also noted that Egas seldom experienced deficiencies of concentration, persistence or pace and that there recently had been treatment which indicated an improvement in Egas' condition.

Finally, on May 12, 1999, Dr. McGrath assessed Egas' ability to perform work-related activities. Dr. McGrath reported that Egas had phobia, agoraphobia and major depression. He noted that since beginning treatment, Egas' depression had diminished but his phobias remained and he rarely left home. Dr. McGrath opined that Egas' condition would eventually respond to treatment. Dr. McGrath found that Egas' impairments moderately limited his ability to understand and remember very short and simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, ask simple questions, maintain socially appropriate behavior, neatness and cleanliness and be aware of normal hazards. Dr. McGrath further found that Egas' ability to understand and remember detailed instructions was markedly limited as was his ability to interact with the general public and take public transportation.

## IV. The ALJ's Decision

On June 9, 1999, ALJ Robert Hanson determined that, for the purpose of disability insurance benefits and supplemental and security income, Egas was not disabled. In reaching this conclusion, the ALJ performed the five-step analysis required by SSA regulations. 20 C.F.R. §§ 416.920, 404.1520. The ALJ found that Egas was "unable to perform his past relevant work as a packer and order filler, inspector, or laborer" and had "not engaged in substantial gainful activity at any time relevant to this decision." (*Id.* at 21, ALJ Decision.) In addition, the ALJ found that the "medical evidence establishes that the claimant's anxiety constitutes a 'severe' impairment,"[3] that the "claimant retains the residual functional capacity to perform simple and repetitive work at all exertional levels provided it does not involve unusual stress, work in small confined spaces, interaction with the general public, or more than superficial contact with coworkers" and that the "claimant's subjective complaints and allegations concerning the severity of his impairments are not reasonably consistent with the objective medical and other evidence of record." (*Id.*) Based on the vocational expert's testimony, the ALJ determined that there were a "significant number of jobs in the national economy that [Egas] could perform," including such jobs as an office cleaner (4000-5000 jobs in the Chicago metropolitan area) and a night watchman (1500-2000 jobs). (*Id.*) Therefore, the ALJ concluded that "because [Egas] remains able to perform jobs existing in significant numbers in the national

---

[3] We note that, pursuant to 20 C.F.R. § 404, anxiety-related disorders include Egas' social phobia and agoraphobia. Accordingly, the ALJ's decision properly referenced Egas' impairments, and the ALJ properly considered the unique functional restrictions imposed by these conditions.

6

economy, the claimant has not been disabled, within the meaning of the [Social Security] Act, at any time relevant to this decision." (*Id.*)

Currently before this Court is Egas' motion for summary judgment. On appeal, Egas contends that the ALJ's decision to deny him benefits was not supported by substantial evidence. Additionally, Egas argues that the ALJ improperly rejected a portion of Dr. McGrath's report, that the ALJ's credibility finding was erroneous and that the vocational expert hypothetical was incomplete. For the following reasons, we deny Egas' motion and affirm the ALJ's decision.

## LEGAL STANDARDS

The standard of review for final decisions of the Social Security Commissioner (here the ALJ) in federal benefits cases is deferential. *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993). The Social Security Act establishes that the Commissioner's findings as to any fact are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1972) (quotation omitted). In other words, the ALJ's findings must be supported by more than a mere scintilla of the evidence, but they may be supported by less than the greater weight of the evidence. *See id.* In reviewing the ALJ's decision, we may neither substitute our own judgment for that of the ALJ nor reweigh the facts or evidence. *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

To receive disability benefits, a claimant must be "disabled" as defined by the Social Security Act. An individual is disabled if he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 416(i). Social Security regulations require the use of a five-step process to determine whether a claimant

is disabled. *See, e.g., Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999). At issue in this case are: (1) whether the ALJ improperly weighed the medical evidence; (2) whether the ALJ's credibility findings were unsupportable; and (3) whether the ALJ improperly applied step five of the disability analysis. Step five requires the ALJ to determine if, considering age, education and work experience, the claimant can perform work available in significant numbers in the national economy. 20 C.F.R. § 404.1520.

**ANALYSIS**

Egas presents three principal arguments supporting his claim for relief: (1) the ALJ improperly rejected a portion of the opinion of Egas' treating psychiatrist, Dr. McGrath; (2) the ALJ's credibility findings regarding Egas were unsupportable; and (3) the ALJ improperly applied step five of the SSA's disability analysis. We address each claim in turn.

**I. Whether the ALJ Improperly Discounted a Portion of Dr. McGrath's Opinion**

Egas argues that substantial evidence does not support the ALJ's findings regarding his impairments. Specifically, Egas contends that the ALJ improperly rejected the portion of Dr. McGrath's opinion which stated that Egas had a moderate limitation in his ability to perform activities within a schedule and to maintain regular attendance or socially appropriate behavior.[4]

An ALJ's decision must be based on the testimony and medical evidence in the record. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). Substantial weight must be given to the

---

[4] Egas claims that Dr. McGrath's opinion should have been given controlling weight by the ALJ. We disagree. A treating physician's opinion is only given controlling weight if it is, *inter alia*, "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). We find that the portion of Dr. McGrath's opinion that the ALJ rejected is inconsistent with the other substantial medical evidence in the record. Therefore, we do not give controlling weight to Dr. McGrath's opinion.

8

medical evidence and opinions submitted, "unless specific, legitimate reasons constituting good cause are shown for rejecting [them]"; for example, "[m]edical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." *Knight v. Chater*, 55 F.3d 309, 313-14 (7th Cir. 1995) (citing 20 C.F.R. § 404.1527(c)-(d)). Where treating and consulting physicians present conflicting opinions, the ALJ must decide the conflict. *See, e.g., Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

In this case, the ALJ properly rejected the portion of Dr. McGrath's assessment that Egas had moderate limitations in his ability to perform activities within a schedule and to maintain regular attendance or socially appropriate behavior because the record as a whole did not evince significant impairment in any of these areas. The ALJ cited the fact that none of the other three examiners, Drs. Vora, Kuester and Hudspeth, reported any socially inappropriate behavior. Rather, they indicated social behavior well within the normal limits. Furthermore, the ALJ observed that Egas cared for his young son "with no evidence that he [could] not recognize and avoid hazards." (R. 11-1, Admin. R. at 19, ALJ Decision.) Drs. Kuester and Hudspeth both found that Egas was not significantly limited regarding the above stated activities. (*Id.* at 147, 166, Kuester and Hudspeth Functional Capacity Assessment.) Additionally, Dr. Vora noted findings quite contrary to those of Dr. McGrath, stating that: "The patient related well and his behavior was appropriate. He was not withdrawn and was able to understand and carry out instructions. He handled the stress of the interview well." (*Id.* at 146, Vora Psychiatric Examination.) Indeed, this assessment was made prior to Egas being favorably medicated with Paxil. Therefore, the ALJ's medical findings were supported by substantial evidence and he properly discounted a portion of Dr. McGrath's opinion.

## II. Whether the ALJ's Credibility Findings Regarding Egas were Unsupportable

Next, Egas argues that the ALJ's credibility findings were unsupportable and erroneous. Specifically, Egas contends that the ALJ failed to consider certain factors when he made his credibility determination, including the consistency of Egas' reports to his doctors and to the SSA, the medical evidence and Egas' work history and candor.[5]

The ALJ's determination regarding a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski v. Apfel*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting Social Security Ruling 96-7p). In other words, it is not sufficient for the ALJ to make a single conclusory statement that the claimant's allegations of pain have been considered and/or found not credible. *Id.* Instead, the ALJ must "build a bridge from the evidence to his conclusion." *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000). The weight to be given a particular piece of evidence is within the ALJ's discretion. *Diaz v. Chater*, 55 F.3d 300, 309 (7th Cir. 1995). The Seventh Circuit has held that, because the

---

[5] Egas also claims that the ALJ ignored an "important line of evidence" because he did not discuss all of Egas' self-reported episodes of deterioration or decompensation. (R. 12-2, Pl.'s Mem. in Supp. of its Mot. for Summ. J. at 11.) Egas argues that inclusion of these episodes in the hypothetical question to the vocational expert may have resulted in different testimony. We disagree. The ALJ acknowledged that Egas had experienced an episode of deterioration or decompensation. He did not ignore a line of questioning, but rather merely declined to credit all of Egas' statements. The ALJ is not required to discuss every piece of evidence in the record, *Diaz v. Chater*, 55 F.3d 300, 309 (7th Cir. 1995), and the medical evidence in the record failed to demonstrate that Egas experienced repeated episodes of deterioration or decompensation in a work environment.

10

ALJ is in the best position to determine credibility, the ALJ's credibility findings will not be disturbed unless they are "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

In the case at bar, the ALJ assessed the credibility of Egas' subjective complaints as prescribed by 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) and Social Security Ruling 96-7p, and the ALJ determined that Egas' allegations regarding the severity of his impairments were not reasonably consistent with the other evidence contained in the record. The ALJ asserted that the extent of Egas' daily activities was contrary to his allegations of an inability to perform work-related activities. He also noted that, with regard to the location, duration, frequency and intensity of Egas' symptoms, the record contained no confirmation of his alleged inability to leave home and no documentation of Egas' reports that he experienced sweating, shaking, flushing and trembling lips when he was around people. The ALJ noted that none of the doctors found any of these symptoms and, in fact, Dr. McGrath cited improvement in Egas' mood. Furthermore, with respect to any precipitating and aggravating factors relating to Egas' condition, the ALJ considered Egas' reports of increased anxiety in enclosed spaces and provided for this impairment in his hypothetical question to the vocational expert. As such, we reject Egas' contention that the ALJ "failed to discuss other very important issues." (R. 12-2, Pl.'s Mem. in Supp. of its Mot. for Summ. J. at 13.) As stated above, the ALJ is not required to analyze every factor relating to credibility. Moreover, according to Social Security Ruling 96-7p, the internal consistency of Egas' complaints is merely a guideline for the ALJ to evaluate Egas' credibility, and no matter how consistent Egas' complaints may have been, the fact that the objective medical evidence contradicts his allegations of disabling anxiety is far more

11

determinative. Therefore, we conclude that the ALJ's credibility findings regarding Egas were supported by substantial evidence.

### III. Whether the ALJ Improperly Applied Step Five of the Disability Analysis

Finally, Egas claims that the ALJ improperly applied step five of the disability analysis. 20 C.F.R. §§ 416.920(f), 404.1520(f). Specifically, Egas argues that the hypothetical question posed by the ALJ was incomplete in that it failed to include all of the limitations actually found by the ALJ; *i.e.*, that there was a moderate limitation in Egas' ability to maintain attention and concentration for extended periods and Dr. McGrath's opinion that there was a marked limitation in Egas' ability to use public transportation or travel to unfamiliar places.

The hypothetical question presented by an ALJ to a vocational expert "must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record." *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994). Every detail of a claimant's impairment need not be included in the hypothetical but, if the medical evidence establishes that a claimant has specific impairments, those impairments must be presented to the vocational expert or his opinion will not constitute substantial evidence. *See Cass v. Shalala*, (7th Cir. 1993).

In this case, the ALJ found that Egas "retains the residual functional capacity to perform simple and repetitive work at all exertional levels provided it does not involve unusual stress, work in small confined spaces, interaction with the general public, or more than superficial contact with coworkers." (R. 11-1, Admin. R. at 21, ALJ Decision.) The hypothetical question presented to the vocational expert accurately described Egas' limitations as found by the ALJ. (*See id.* at 62, SSA Hr'g Tr.) The ALJ did not need to include every detail of Egas' impairment

in the hypothetical, and the record indicates that the vocational expert considered the moderate limitation in Egas' ability to maintain attention and concentration. The vocational expert accounted for this impairment by considering a hypothetical person who was "limit[ed] to work processes that are simple and repetitive in nature [and] do not involve unusual stress." (*Id.*) Moreover, the ALJ made no finding – and the medical evidence did not support a finding – that there was a marked limitation in Egas' ability to use public transportation or travel to unfamiliar places.[6] Only Dr. McGrath indicated that Egas was limited in these areas, whereas both IDDS doctors found no significant limitation in these areas. (*Id.* at 148, 167, Kuester and Hudspeth Functional Capacity Assessment.) In sum, the ALJ posed an accurate hypothetical to the vocational expert and we decline Egas' invitation to re-evaluate the vocational expert's testimony that a significant number of jobs exist in the Chicago metropolitan area which Egas could perform given the limitations found by the ALJ. Therefore, the ALJ's determination at step five was supported by substantial evidence in the record.

## CONCLUSION

For the reasons contained in this opinion, we deny Egas' motion for summary judgment, (R. 12-1), and grant the Commissioner's cross-motion for summary judgment, (R. 13-1). The

---

[6] Egas repeatedly argues that his "ability to leave home and his functioning at that time is what is at issue." (R. 15-1, Pl.'s Reply at 1.) While we acknowledge that Dr. McGrath reported that Egas "rarely leaves home" and that Egas missed three of seven appointments with Dr. McGrath, we find that the record as a whole demonstrates that Egas regularly left his home for medical treatment and disability proceedings and to visit his family and that he was never noted to display symptoms of marked distress or panic attacks, or even excessive shaking as would be indicative of a severe anxiety disorder. (R. 11-1, Admin. R. at 146, Vora Psychiatric Examination.) *See also supra* note 2.

Clerk of the Court is instructed, pursuant to Federal Rule of Civil Procedure 58, to enter

judgment in favor of Defendant.

                                    **ENTERED:** _____

                                                    **Judge Ruben Castillo**
                                                    **United States District Court**

**Dated: July 6, 2001**